UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES GLAVAN, *individually and on behalf of all others similarly situated*,<br><br>                                   Plaintiff,<br><br>                    -v-<br><br>REVOLUTION LIGHTING TECHNOLOGIES, INC., et al.,<br>                                   Defendants. | 19-CV-980 (JPO) |
| CHRIS HUBNER, *individually and on behalf of all others similarly situated*,<br><br>                                   Plaintiff,<br><br>                    -v-<br><br>REVOLUTION LIGHTING TECHNOLOGIES, INC., et al.,<br>                                   Defendants. | 19-CV-2308 (JPO) |
| BOB BISHOP, *individually and on behalf of all others similarly situated*,<br><br>                                   Plaintiff,<br><br>                    -v-<br><br>REVOLUTION LIGHTING TECHNOLOGIES, INC., et al.,<br>                                   Defendants. | 19-CV-2722 (JPO)<br><br>OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

These three related cases involve claims brought under the Securities Exchange Act of

1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*, against Revolution Lighting Technologies, Inc.

("Revolution") and three of its former and current officers on behalf of a putative plaintiff class

consisting of certain investors who acquired Revolution securities between March 14, 2014, and

1

November 14, 2018.  (Dkt. No. 1 ("Compl.") ¶¶ 1, 16–19, 70–84.[1])  Currently before the Court are several competing motions filed by putative class members, each of which asks the Court to consolidate the three cases, appoint the movant as lead plaintiff, and approve the movant's chosen counsel as lead counsel.  (Dkt. Nos. 7, 10, 13, 16, 19, 22.)  For the reasons that follow, Fred Remer's motion to consolidate the cases, be appointed lead plaintiff, and have Faruqi & Faruqi, LLP approved as lead counsel (Dkt. No. 22) is granted.  All other motions are denied.

## I.    Background

On January 31, 2019, Plaintiff James Glavan filed a complaint on behalf of a class of investors who acquired Revolution securities between March 14, 2014, and November 14, 2018. (Compl. ¶ 1.)  The complaint alleges that Revolution and three of its officers violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and that the officers are also liable as "control persons" under Section 20(a) of the Exchange Act, *id.* § 78t(a).  (Compl. ¶¶ 70–84.)

According to the complaint, Revolution made positive investor-facing statements about its operations and future prospects during the class period, including statements attesting to the soundness of its internal financial-reporting controls.  (Compl. ¶¶ 24–44.)  But, Glavan alleges, these statements "were materially misleading and/or lacked a reasonable basis" (Compl. ¶ 9) because Revolution had in fact adopted an improper accounting method that caused it to overstate its revenues (Compl. ¶ 47).  To make matters worse, the complaint goes on, Revolution neglected to inform its investors that the U.S. Securities and Exchange Commission had been investigating it for its use of these very accounting practices.  (*Id.*)  As a consequence, Glavan alleges, Revolution's securities traded at artificially inflated prices until a series of corrective

---

[1] All docket citations refer to the docket in *Glavan v. Revolution Lighting Technologies, Inc.*, No. 19 Civ. 980, unless otherwise noted.

disclosures spanning from October 17, 2018, to November 14, 2018, brought Revolution's stock prices down to more realistic levels.  (Compl. ¶¶ 45–51.)

The same day he filed his complaint, Glavan published a press release on *Business Wire* about the pending lawsuit.  (Dkt. No. 21-1.)  The press release informed readers that, under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-1 *et seq.*, any putative class member interested in serving as lead plaintiff had sixty days within which to file a motion with the Court, *see id.* § 78u-4(a)(3)(A)(i)(II).  (Dkt. No. 21-1.)

During this sixty-day period, Plaintiffs Chris Hubner and Bob Bishop each filed separate putative class action lawsuits against Revolution and the same three corporate officers that had been named in Glavan's suit.  (*See Hubner*, No. 19 Civ. 2308, Dkt. No. 1; *Bishop*, No. 19 Civ. 2722, Dkt. No. 1.)  The complaints in Hubner and Bishop's cases are materially identical to Glavan's complaint (*see id.*), with the exception that Bishop's complaint alleges two additional corrective disclosures, dated September 22, 2017, and August 2, 2018, that caused Revolution's share prices to drop (*Bishop*, No. 19 Civ. 2722, Dkt. No. 1 ¶¶ 3–6, 44–45, 48–49).

Back in the *Glavan* case, six putative class members or groups of putative class members filed timely motions to consolidate the *Glavan*, *Hubner*, and *Bishop* cases; to be appointed lead plaintiff(s); and to have their chosen counsel approved as class counsel.  (Dkt. Nos. 7, 10, 13, 16, 19, 22.)  Three of these motions—those filed by Craig Holman and Russell Hopewell; Xinying Gong; and Chris Hubner—have since been essentially withdrawn and so are denied as moot. (*See* Dkt. Nos. 30–31, 33.)  Remaining before the Court, then, are the competing motions of (1) Patrick and Wendy Graham (the "Grahams") (Dkt. No. 10), (2) The Police and Fire

Retirement System of the City of Detroit ("Detroit P&F") (Dkt. No. 19), and (3) Fred Remer

(Dkt. No. 22).[2]  The Court now turns to the merits of these motions.

## II.    Discussion

### A.    Consolidation

All three pending motions seek the consolidation of the *Glavan*, *Hubner*, and *Bishop*

actions.  (Dkt. Nos. 10, 19, 22.)  Federal Rule of Civil Procedure 42(a)(2) permits consolidation

where "actions before the court involve a common question of law or fact."  Fed. R. Civ. P.

42(a)(2).  In determining whether to exercise its "broad discretion" to consolidate actions that

satisfy that baseline criterion, a court must ask "[w]hether the specific risks of prejudice and

possible confusion" that could arise from consolidation "[are] overborne by the risk of

inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses,

and available judicial resources posed by multiple lawsuits, the length of time required to

conclude multiple suits as against a single one, and the relative expense to all concerned."

*Barkley v. Olympia Mortg. Co.*, 557 F. App'x 22, 25 (2d Cir. 2014) (summary order) (alterations

in original) (quoting *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990)).

The Court easily concludes that consolidation is warranted here.  No party has opposed

consolidation, and all three actions assert identical claims against identical defendants on behalf

of an identical plaintiff class on the basis of almost identical factual allegations.  Nothing would

be gained by litigating these cases separately, and indeed, taking such a course would be

inefficient and would raise the risk of inconsistent outcomes.  *See, e.g.*, *In re Braskem S.A. Sec.*

*Litig.*, No. 15 Civ. 5132, 2015 WL 5244735, at *3 (S.D.N.Y. Sept. 8, 2015) ("Courts routinely

---

[2] Fred Remer has also filed his motion in the *Hubner* and *Bishop* cases.  (*Hubner*, No. 19 Civ. 2308, Dkt. No. 7; *Bishop*, No. 19 Civ. 2722, Dkt. No. 5.)

consolidate securities class actions arising from the same allegedly actionable statements."); *In re Gen. Elec. Sec. Litig.*, No. 09 Civ. 1951, 2009 WL 2259502, at *2 (S.D.N.Y. July 29, 2009) (consolidating actions raising Exchange Act claims where there was "substantial overlap in the complaints").

The Court therefore orders the consolidation of these three actions.[3]

### B.    Lead Plaintiff

The PSLRA tasks the court overseeing a private securities class action with "appoint[ing] as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interest of class members."  15 U.S.C. § 78u-4(a)(3)(B)(i).  Generally speaking, "the most adequate plaintiff" in any such action is presumed to be "the person or group of persons that," in addition to making a timely motion and satisfying certain other generally applicable requirements not at issue here, "has the largest financial interest in the relief sought by the class."  *Id.* § 78u-4(a)(3)(B)(iii)(I)(bb).  This presumption "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff . . . will not fairly and adequately protect the interests of the class; or . . . is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  *Id.* § 78u-4(a)(3)(B)(iii)(II).

Here, all three contenders for lead plaintiff have filed timely motions, and no class member has suggested that any of the movants are incapable of representing the class or are subject to unique defenses.  The Court will therefore appoint as lead plaintiff the movant with "the largest financial interest in the relief sought by the class."  *Id.* § 78u-4(a)(3)(B)(iii)(I)(bb).

---

[3] A fourth related action, *Remer v. Revolution Lighting Technologies, Inc.*, No. 19 Civ. 4252, was initiated after the motions presently under consideration had been filed.  That action will be consolidated with the three present actions pursuant to a separate order.

While the PSLRA "does not provide any explicit guidance about how to calculate" the size of a given plaintiff's financial interest, "[c]ourts in this Circuit have traditionally examined four factors: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period . . . ; (3) the total net funds expended during the class period; and (4) the approximate loss suffered during the class period." *In re Veeco Instruments, Inc.*, 233 F.R.D. 330, 332 (S.D.N.Y. 2005). "It is well settled that '[f]inancial loss, the last factor, is the most important element of the test.'" *Peters v. Jinkosolar Holding Co.*, No. 11 Civ. 7133, 2012 WL 946875, at *5 (S.D.N.Y. Mar. 19, 2012) (alteration in original) (quoting *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 395 (S.D.N.Y. 2008)).

Based on these factors, Detroit P&F is out of the running from the get-go. In its own account, Detroit P&F's maximum damages are $393,624.84. (Dkt. No. 20 at 8.) But both the Grahams and Remer have claimed losses that well exceed this figure (Dkt. No. 12 at 6–7; Dkt. No. 34 at 5–6), and Detroit P&F has offered no rebuttal. The Court therefore concludes that Detroit P&F does not "ha[ve] the largest financial interest in the relief sought by the class," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb), and so is ineligible to serve as lead plaintiff here.

This leaves the Grahams and Remer. As for the Grahams, between the two of them, they acquired 301,286 Revolution shares from July 26, 2018, to September 28, 2018, for a sum total of $1,008,289.69. (Dkt. No. 12-3.) Because those shares were worth only $177,860.87 as of the end of the class period on November 14, 2018, the Grahams claim losses of $830,428.82. (*Id.*)

Remer's story is more complicated. At the time the class period began, Remer already held 11,940 Revolution shares, which he had purchased for a total of $497,737.11. (*See* Dkt. No. 24-3 at 2.) Then, during the class period, Remer acquired 511,517 more shares, for a total cost of $3,157,547.63, and sold a total of 423,457 shares, thereby recouping a total of $2,287,618.82.

(*See* Dkt. No. 24-3 at 11.)  When the dust had settled by the end of the class period, Remer was left holding 100,000 shares, which were worth $622,248.66 less than he had paid for them.  (*Id.*)

In comparing the Grahams and Remer, the Court observes that two of the first three factors used to assess the size of a would-be lead plaintiff's financial stake in the litigation favor the Grahams.  Although Remer purchased more total shares during the class period—511,517 shares, to the Grahams' 301,286—the Grahams acquired a greater *net* total—301,286 shares, to Remer's 88,060.[4]  And by forking out a total of $1,008,289.69 during the class period, the Grahams spent more than the net $869,928.81 that Remer went out of pocket.[5]  But because these factors favor the Grahams only marginally, the Court focuses its attention on the final factor, *i.e.*, the parties' respective losses.  *See Gutman v. Sillerman*, No. 15 Civ. 7192, 2015 WL 13791788, at *4 (S.D.N.Y. Dec. 8, 2015) ("Most courts agree that the largest loss is the critical ingredient in determining the largest financial interest and outweighs net shares purchased and net expenditures." (quoting *Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 479 (S.D.N.Y. 2011))).

As noted above, the Grahams' claimed losses are easily calculated.  The Grahams spent $1,008,289.69 on Revolution shares from July 26, 2018, to September 28, 2018, but after a subsequent series of corrective disclosures alleged to have occurred from October 17, 2018, to November 14, 2018, the value of those shares had dropped to $177,860.87.  (Dkt. No. 12-3; *see also* Compl. ¶¶ 45–51.)  Accordingly, the Grahams' claimed losses are $830,428.82.

---

[4] The Court arrives at the 88,060 figure by subtracting the 423,457 shares Remer sold during the class period from the 511,517 shares he acquired during the class period.  Because the Grahams sold no shares during the class period, the total number of shares they acquired during the class period is the same as the net number of shares they acquired during that period.

[5] The Court calculates Remer's net expenditure by subtracting the $3,157,547.63 he spent during the class period from the $2,287,618.82 he collected by selling shares during that time.

Remer's calculations are trickier.  In particular, because Remer both bought and sold Revolution shares during the class period, he not only suffered losses as a result of the hit Revolution's share prices took after the alleged fraud was revealed to the investing public, but also potentially enjoyed *gains* as a result of sales he made during the time that Revolution's stock was artificially overvalued.  Remer's total losses, then, must be offset by any such gains.

Fortunately, courts have developed a few guiding principles for calculating the losses of a would-be lead plaintiff who both bought and sold shares during the class period.  First, courts in this District will "take[] into account gains that might have accrued to [such a party] during the class period due to the inflation of the stock price" by employing a "last in, first out" ("LIFO") methodology that "calculates losses by assuming that the first stocks to be sold are the stocks purchased most recently prior to that sale."[6]  *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 129 (S.D.N.Y. 2011) (first quoting *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005)); *see also Gutman*, 2015 WL 13791788, at *4 (noting this District's "very strong preference" for the LIFO method (quoting *Rosian v. Magnum Hunter Res. Corp.*, No. 13 Civ. 2668, 2013 WL 5526323, at *1 (S.D.N.Y. Oct. 7, 2013))).  Second, after matching up purchases and sales in this way, not every loss a plaintiff suffers in the ebbs and swells of the marketplace will factor into that plaintiff's overall financial stake in a securities fraud litigation, given that not every loss is causally linked to the alleged fraud.  As a result, "when evaluating a plaintiff's financial interest for purposes of selecting a lead plaintiff, courts in this Circuit consider that plaintiff's *recoverable* loss, and do not take into account losses from shares sold prior to

---

[6] For example, if a plaintiff purchases one share for $1,000 on Monday and one share for $1,200 on Tuesday and then sells a share on Wednesday for $800, the plaintiff's LIFO losses are $400, based on the notion that the share sold on Wednesday is the most recently purchased share, *i.e.*, the share that the plaintiff purchased on Tuesday.

corrective disclosures" that adversely affect stock prices by revealing the alleged fraud. *Gutman*, 2015 WL 13791788, at *4 (emphasis added). Third, after thus accounting for a plaintiff's class-period share sales, "shares that were bought during the class period but were *not* sold during the class period are accounted for as if they had been sold at the average price of the shares in the 90 calendar days following the class period." *In re eSpeed*, 232 F.R.D. at 102 (emphasis added).

Remer contends that when these principles are applied here, his potentially recoverable financial losses during the class period total $1,245,936, a figure that far exceeds the Grahams' own claimed losses of $830,428.82. (*See* Dkt. No. 38-3.) First, as noted, Remer claims losses of $622,248.66 arising out of 100,000 shares he purchased during the class period and continued to hold at the end of the class period. (*See* Dkt. No. 24-3 at 11.) Because the Grahams have not challenged that figure, the Court need only consider the remaining $623,687.34 of Remer's $1,245,936 in total claimed losses. That remainder purportedly derives from Revolution shares that Remer purchased during the class period prior to one or the other of the September 22, 2017, or August 2, 2018 corrective disclosures alleged in the complaint in the *Bishop* case, and that he sold within the class period following the corresponding disclosure.[7] (*See* Dkt. No. 38-3.)

The Court has evaluated Remer's submissions and determined that he has, within a trivial margin of error, correctly calculated the losses associated with the identified sales when those losses are assessed on a LIFO basis. The remaining question, then, is whether those sales, and their corresponding losses, can plausibly be tied to the alleged fraud. And the answer to that

---

[7] The parties differ over how the Court should account for Remer's sale during the class period of the 11,940 Revolution shares he had acquired prior to the start of the class period. (*See* Dkt. No. 36 at 4–5.) Remer has excluded all gains and losses from these sales in arriving at his $1,245,936 figure (*see* Dkt. No. 38-3), and he was right to do so, *see Foley*, 272 F.R.D. at 129 ("Since sales matched with pre-class period purchases are not included in the calculation of class period losses, any gains or losses from [such] sales would not be included in the total loss.").

9

question, in turn, depends on whether the September 22, 2017, and August 2, 2018 disclosures to which Remer seeks to tie the $623,687.34 in losses derived from these sales were sufficiently revelatory of the alleged fraud to establish a causal link between the fraud and the losses. Critically, though, the Grahams themselves accept the September 22, 2017, and August 2, 2018 disclosures as "corrective disclosure[s]" for purposes of loss calculation. (Dkt. No. 32 at 1 n.2.) And even though it may turn out, upon development of the facts, that not all of Remer's claimed share-sale losses were indeed causally linked to the alleged fraud, the record at this early stage in the litigation offers the Court no reason to believe any portion of the claimed $623,687.34 figure is "*clearly* not recoverable." *Gutman*, 2015 WL 13791788, at *5 (emphasis added); *see also Weiss v. Friedman, Billings, Ramsey Grp., Inc.*, No. 05 Civ. 4617, 2006 WL 197036, at *4 (S.D.N.Y. Jan. 25, 2006) (including certain asserted losses in the calculation of a would-be lead plaintiff's financial stake where "one would not *necessarily* have to conclude that the . . . losses [were] unattributable to the alleged fraud[]" (emphasis added)).[8]

The Court therefore accepts Remer's claimed figure of $1,245,936 ($622,248.66 from shares Remer bought during the class period and held through the end of the class period, plus $623,687.34 from shares Remer bought and sold during the class period) as the measure of Remer's total potentially recoverable financial loss. Accordingly, the Court concludes that Remer is the movant with "the largest financial interest in the relief sought by the class." 15

---

[8] The Court notes that if Remer were relying *exclusively* on the September 22, 2017, and August 2, 2018 disclosures and did not, for example, retain any Revolution shares at the time of the subsequent October 17, 2018, to November 14, 2018 disclosures that form the sole focus of the *Glavan* and *Hubner* complaints, the Court might have concerns about Remer's adequacy to serve as lead plaintiff. *See, e.g.*, *Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 241 (E.D.N.Y. 2011) (refusing in a case with multiple corrective disclosures to appoint a lead plaintiff that relied exclusively on a single disclosure for its theory of loss). Here, though, because Remer retained some level of investment during the course of the entire class period and so was potentially affected by each alleged corrective disclosure, the Court has no such concerns.

U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).  Because the Court has no reason to doubt that he otherwise satisfies the PSLRA's requirements, the Court appoints him as lead plaintiff in this action.

### C.      Lead Counsel

Under the PSLRA, the lead plaintiff is entitled, "subject to the approval of the court, [to] select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v).  Remer, whom the Court has now appointed lead plaintiff, has chosen Faruqi & Faruqi, LLP ("Faruqi") to serve as lead counsel.  Faruqi has extensive experience in securities fraud litigation (*see* Dkt. No. 24-4 at 1–2), and no class member has offered any reason why Faruqi would be ill-equipped to act as lead counsel in this consolidated action.  This Court therefore concludes, as have other courts in this District, that Faruqi "has the requisite experience necessary to serve as lead counsel, and thus will be able to effectively prosecute the consolidated action."  *Reitan v. China Mobile Games & Entm't Grp., Ltd.*, 68 F. Supp. 3d 390, 401 (S.D.N.Y. 2014).

### III.     Conclusion

For the foregoing reasons, Fred Remer's motion to consolidate these three related cases, to be appointed as lead plaintiff, and to have Faruqi & Faruqi, LLP approved as lead counsel is GRANTED.  The corresponding motions of Xinying Gong; Patrick and Wendy Graham; Russell Hopewell and Craig Holman; Chris Hubner; and The Police and Fire Retirement System of the City of Detroit are DENIED.

Pursuant to Federal Rule of Civil Procedure 42(a), the above-captioned actions are to be consolidated under Case Number 19 Civ. 980 for all purposes, including discovery, pretrial proceedings, and trial.  Every pleading filed in this consolidated action shall be captioned "In re: REVOLUTION LIGHTING TECHNOLOGIES, INC. SECURITIES LITIGATION."

Within ten days of the date of this order, the parties shall file a joint letter proposing a schedule for filing an amended complaint and for filing and briefing Revolution's anticipated motion to transfer.

The Clerk of Court is directed to close the following motions:

- Docket Numbers 7, 10, 13, 16, 19, and 22 in *Glavan v. Revolution Lighting Technologies, Inc.*, No. 19 Civ. 980;

- Docket Number 7 in *Hubner v. Revolution Lighting Technologies, Inc.*, No. 19 Civ. 2308; and

- Docket Number 5 in *Bishop v. Revolution Lighting Technologies, Inc.*, No. 19 Civ. 2722.

SO ORDERED.

Dated: July 29, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge

12